May it please the Court, I represent Mr. Finley. The arrest in this case of Mr. Finley was unlawful because it was without probable cause. Now, both the magistrate judge and the district court judge in this case reasoned that there was no probable cause for the initial attempt to arrest, but that Mr. Finley's flight provided independent probable cause to believe that he had committed the offense of fleeing by means other than a motor vehicle under the Minnesota statute. And on that basis, they upheld his arrest and then the eventual which led to the seizure of the gun, the crime he's committed of. That analysis is incorrect because it misses that the fleeing offense under the Minnesota statute is a specific intent crime. Slow down with me, because to what extent does the Flores-Lagunas case answer the very issue you say in black and white? I don't think that Flores-Lagunas answers — there are several responses here. The first is that I think Flores-Lagunas is factually distinguishable. So in Flores-Lagunas, the officers loudly announced from the very beginning that they were law enforcement. So the premise of my argument is that Finley did not know he was being accosted by law enforcement. There was never any announcement during that initial encounter of were cops, were police, stick them up. In fact, what was said is put your fucking hands up. And you can see from the reaction in the body cam footage, he's absolutely terrified. His body goes crazy. He throws his cell phone. You know, it's like that experience when someone surprises you and you get terrified and then magnify that by having a gun. That is utterly distinguishable from Flores-Lagunas. And that matters for the point that I'm making, because in Flores-Lagunas, when the officers loudly announced that they're cops from the very outset, then Mr. Flores-Lagunas knows that when he flees, he's fleeing police because they've told him he's a police. They weren't wearing identified vests that had been used? They were, but again, they were, Your Honor. But if you look at the surveillance footage from the officer who opened the door, I believe Officer, well, I can't remember who it was, Dobler or Stetson. I think Dobler. But anyway, they had their guns drawn. So you can't see a police. And there was testimony at the motions hearing that understandably, when all of a sudden you get surprised with a gun, you tend to focus on the gun, not the finer details of your coster's garb. So in Flores-Lagunas, they say right away, law enforcement. Here, there's nothing like that. And the guy, Mr. Finley, is completely scared out of his mind by having a gun pointed at him. And it's not like he sees the police coming. You can see that he's looking down at his phone. All of a sudden, the door is open. Put your fucking hands up, and a gun is pointed at him and held with both hands. Right? One hand is used to open the door, but before the officer even finishes saying, put your fucking hands up, both of the hands are on the gun. So I think that the record shows that he did not see the police on the chest. It was obscured by the officer holding the gun. Moreover, you focus on the gun. And so it's completely distinguishable from Flores-Lagunas in a way that matters for the legal pith of my argument. Okay. You're doing a good job, but I'd like you to address the black letter language, which I'm certain you've seen, that says, a defendant's response to an arrest or territory stop, even in a valid one, may constitute another sentence. Resistance by fleeing the scene provides infinite grounds for arrest. And a third would, in this circuit, resistance to an illegal arrest. Illegal arrest, we say several times, can furnish grounds for a second legitimate arrest. Those kind of three sentences, tell me how you can work with those. Okay. Well, first off, I begin by noting that neither the magistrate judge nor the district court judge based their reasoning on resisting. They based their reasoning on fleeing. And I think that the courts missed that nuance. You know, because below, remember, both Mr. Finley and Mr. Somerville argued essentially what I just said, that they didn't know they were cops. And the analytical move made by both the district court and the magistrate judge to get around that argument was to say, look, that doesn't matter. You're focusing on the perspective of the wrong person. You're focusing on the perspective of the person who's arrested, but probable cause is assessed on the basis of the perspective of the officer. And here the officers knew they were, you know, in the lawful discharge of their duties. They knew they were cops, yada, yada. But what that missed, that is true, that we look at it from the perspective of the officer. But because the fleeing offense is a specific intent crime, an essential element of that offense is not that just you voluntarily flee, but that you flee with the specific purpose of evading arrest, i.e., you have to know you are fleeing from law enforcement. So the elements of the offense under controlling the minister. How is that established or proven, what was in the mind of the defendant or the arrestee? I mean, intent is always a tricky thing for the law, right? We can never get inside people's heads. So intent is proved in the way that we always look at intent. You know, what's the behavior, what are the circumstances, things like that. You know, we can never get inside people's heads. But here I think the circumstances show that Mr. Finley did not know they were law enforcement. They never said they were law enforcement. Is it required that law enforcement identify verbally or orally? I don't know if I'd say it's required. Identifiable is not enough under the controlling law, right? I don't know that the rule is that they must say they're police, but the rule is certainly not as long as there's police somewhere it's okay, because that doesn't square with the elements of the offense of fleeing under Minnesota law. It's a specific intent crime. So an essential element is that the person has to intend to evade arrest, has to know they're law enforcement they're fleeing from, and intend by the voluntary act of fleeing to evade that arrest. Go ahead, finish your thoughts. So it's not enough to simply have police somewhere, right? I'm not saying that whether or not you say police is dispositive. It is certainly relevant, certainly relevant. Obviously if they had said police, then there would be no argument that when the person ran they knew they were fleeing from police, okay? But it certainly cannot be the rule that as long as there's police somewhere, like they have police on their sock. And so like you could identify them that that's enough, that's ridiculous. So it's not that they are identifiable. You have to look at the circumstances to try to get into the mind of the person who's fleeing. And here we have video evidence. You can see that Mr. Finley Was there any additional communication once the flight began? Nothing that indicated they were law enforcement. They're, they're, they're, they're, later on when he's on the ground, at that point there are things, police, you're under arrest. But during the flight, no. And that was the, that was the basis for the magistrate judge and the district court getting around the argument of Mr. Finley and Mr. Somerville below. But they missed this complicating factor of felony fleeing being a specific intent crime. And here I think given the fact that he's obviously completely terrified, given the fact that it was established through testimony and common sense that when you're completely surprised and terrified just because you're surprised, and then you have a gun pointed at you and someone says, put your fucking hands up, and they're holding it with two hands where the word police is written here, and they're holding it like this, I think it is a far greater chance that they do not know that that person is a police officer. I mean the decision to try to run is made instantaneously. And so I think that, again, intent is a complicated thing, but I think all of those factors lead to the conclusion that Mr. Finley did not know that he was being accosted by an officer. The magistrate judge, sorry. So what's our review standard of the decision below, looking at the totality of the circumstances, to conclude that Finley was aware sufficiently to be fleeing? What's our review standard of that determination? So there's two review standards, factual findings, clear error, and then the ultimate legal question, de novo. So I think that some of these things relate to factual findings and some of these things relate to the de novo standard. We do have the video evidence. It is completely irrefutably clear from the video evidence that he did not see the officers coming. He's looking down at his phone. One of the things that the government points out is like, hey, you know, he was approached by two officers, they both have police. He doesn't know he's approached by two officers. He's sitting there looking at his phone, the door is open, he's completely terrified. When he looks and sees the gun, you know, the terror is magnified, and then there's an instantaneous decision to run. And there's no communication at that point at all whatsoever about the person being police. Well, are we reviewing that as a clearly erroneous determination? If the court believes that the magistrate judge and the district judge found as a factual matter that Mr. Finley is, let me think about this, this is a complicated question because there's that double standard of review. I think whether he was aware they were police, I think fairly probably would be a factual question. How that relates to the law under specific intent under Wilson would be a legal analysis. So I think you have sort of both standards of review in play. I think that the evidence here shows that he meets either, frankly, the more difficult standard of clear error because there's nothing establishing that he knew they were police. He saw one person, testimony established that you focused on the gun. That's just common sense. I mean, the gun is literally like, I don't know, five feet away from him, six feet away from him, and the command is to put your fucking hands up. Was there additional instructions as well? There was nothing indicating they were police until after he was already. Weren't there additional instructions to get out and to put your hands up? Or was anything like that communicated as well that might be consistent with police instructions as opposed to carjacking demands? Well, no, I would disagree with that, Your Honor. I think carjackers want you to get out of the car too. True, but. So, no, I don't think an instruction to get out of the car is inconsistent with carjackers. And I don't think to put your hands up is inconsistent with the carjacker. I'm trying to determine from you if there were additional. I don't think that there was anything, I don't think you could say that Mr. Finley, and I see I'm going way over my time here, Your Honors, and I do want to respect my co-counsel, but I don't think there's anything that establishes that Mr. Finley knew they were police until they're already on top of him and he's down on the pavement. I think at that point, you could say, then they start saying things like you're under arrest and that's consistent with police conduct. But in that initial encounter, no, I don't think so. Well, counsel, doesn't that really go to whether, whether these appellants are guilty of the violation of this Minnesota statute and not to the issue of the, of their seizure? No, I don't think so because the probable cause standard is whether a reasonably prudent person would have grounds to believe. You said that there's specific intent, a specific intent crime, this fleeing. Yep. And doesn't that come up at a trial if they're, if they're brought to trial for fleeing, for violating the statute? Sure, yeah, of course, all the elements come up at a trial, but they also all come up in the probable cause analysis because it's probable cause to believe they committed an offense. What's the offense? The offense is felony fleeing. What are the essential elements of felony fleeing? One of them is specific intent. So the magistrate judge and the district court blithely got around the objections of Finley and Somerville by saying, we don't care about your perspective, we just care about the perspective of the officers. And that is legally wrong because it is misconstruing the statute. The controlling law of the statute says, no, no, we do care about the perspective of the person who runs because they have to run with the purpose to evade arrest. You can't run with the purpose of evading arrest without knowing that your pursuers are law enforcement. That doesn't make any logical sense. So, yes, you're absolutely correct. Of course, specific intent, along with all the other elements, are proved in a trial or have to be established at a plea. But they're also equally relevant for the probable cause analysis because it's probable cause to believe that an offense has been committed. And we judge whether offenses have been committed by examining the elements. Thank you, Mr. Myers. Good morning, and may it please the Court. My name is Brian Pasigian. I represent Appellant Somerville, as I was his trial counsel as well. Your Honors, I think that we had three issues in our appeal. And the first one has been, I think, there's been a good dialogue about that identical issue for Somerville in that the independent flight doctrine and what should the court do about the district court's ruling in that matter. I'd like to focus on our third issue, which I think is the most interesting issue. And that is whether or not when the district court sent out and received answers to written questionnaires, the court had reviewed all of them and decided not to share any of those questionnaires with counsel for the government or for the defense. We had raised that issue and preserved it for appeal. And it's my understanding that Judge Magnuson's chambers did indeed forward all of those written questionnaires over to this court to be a part of the record and for your review. To date, I have still not seen any one of the written questionnaires, the answers that any of the prospective jurors answered. Counsel, is there any precedent on this? Your time's short. Not that I'm aware of, but it is an abusive discretion. Okay, what's your closest case? I don't have a closest case, honestly. I've got the Sixth Amendment. You've got Supreme Court cases even. I did. What's your best authority? The Sixth Amendment. Okay. It is. And this is a novel issue. This is a situation, can you imagine being in a trial and having the judge say, there's a question posited to you as a prospective juror, but I'm going to bring you up to the bench and have you answer it, and the lawyers don't get to hear your answer. We didn't have one situation like that. We had 30 or however many prospective jurors there were, and a questionnaire that was about 20 questions long, including, but not limited to, the very important question about race and likelihood of commission of a crime based on what we had as a black defendant in this case. Attitudes about police officers in a very charged atmosphere post-George Floyd here in Minneapolis, and questions about fundamental due process and the ability to enforce those tenets that we hold so dear in our American criminal courtrooms. Judge Magnuson was troubled. Was there any concern raised during the trial, during VORDAR, during any part in the trial that any of the jurors that were seated were in some way inappropriately a part of the trial or participated in a manner detrimental to the interests of your client? Not that we know of. But what we don't know is a situation, for example, experience tells me that jurors are actually more honest in written questionnaires, especially about items that they don't want to talk about around their peers, like if they have a racial bias or the like. They tend to be more honest in a written questionnaire than raising their hand in front of 30 people. I've had that experience many times in trials. So we're looking for things like, are you saying something inconsistent where you're telling a judge, saying, you'll be fair to these black defendants, right? And the jurors go, yes, of course we will. They may have written something different. I did not have the ability to find out because we were deprived of the very answers to the jury. You can't un-ring that bell. Did you at any time ask them, what did you write on the jury questionnaire from the judge? I wasn't allowed to ask any questions during vordure. We were not permitted to have brought that motion. That's dodgy. Did you ask the judge to ask the jury that question? I asked the judge to give us copies and allow us to use these cases. But did you ask the judge to ask them if there's anything on there? Let's take the three big things, racial bias, law enforcement, and innocent until proven guilty, okay? Sure. Take those three big ones. Did you ask the judge to ask them? On your questionnaire, did you write something that should be disclosed to counsel or anything like that or any question about them? No, but I don't know how that would help because jurors aren't going to know what jurors shouldn't be. Well, I have a question. Can you write, but don't answer that. Okay. Don't answer that. Now, I've seen the transcript here, and I noticed the co-counsel joined in the objection. Right. It's not in the brief on appeal, but it joins in the objection. But, so just help me on that part of it because that will be the issue here. You know, this is kind of an all or nothing deal. Sure. Kind of structural error, I bet, by the time we're done. So help me with what says this is such a big error, it should be an all as opposed to a nothing for you. Because it goes to the heart of a defendant's right to select a jury and their decision about whether jurors should be struck for a cause or use a peremptory. It's a service amendment right, and it's guaranteed to the defendant. And the defendant has all the right in the world to strike anybody for almost any reason they want to. But we were deprived of the answers, and these weren't just regular answers. These were answers that were troubling Judge Magnuson. You cannot take that back once that information is let out. Once the court made the decision to send out and receive answers from jurors and not share those with the defense counsel, that guides our ability to whether we have, we couldn't even articulate a strike for cause because we don't know what they said. That's where the error was made. I'd like to reserve one minute for a bottle of free bottle. What efforts did you take to obtain the questionnaires? We had asked the judge, and there's a record of that, that we wanted to see these questionnaires. And the judge overruled our objection to keeping them. I did ask him at that point, then, please save all of these written questionnaires for the Eighth Circuit so we have them for appeal. Okay, and he said he would do that. He did. And he would make it part of the record, right? And he did, and it's my understanding they sent them to you. After that, what request or effort did you make in behalf of your client to obtain the questionnaires, like in the course of this appeal? We had confirmed with Chambers that they sent them to the court for the record. The judge at Magnuson denied our request to see them. I couldn't ask him to see them again. He told us, no, we could not see them, that the best he was going to do is save them for you. So there's an appeal. It leaves the district court. It's with this court. Were there any efforts made to obtain the questionnaire so that you could incorporate what you might learn there in your briefing or in your argument today? No, because I understand his ruling to be you are not going to see these. I'm going to keep them in camera for the Eighth Circuit. But once they come to the Eighth Circuit, they're under our jurisdiction. Understood. Okay. One last question. Was there any effort post-trial for a remedy to examine the jurors or those that sat to determine if there had been any bias? No, Your Honor. I don't know how we could have done that without having these questionnaires to look at it with that lens. That's where I think the big error is. We couldn't even see them so we can articulate. I'm fighting with one hand behind my back trying to tell you there's problems here. But I haven't been able to articulate them because you have them and the district court have them. And to date, I still have not seen them. That's all right. Counsel, we've used up your time. We've questioned both of you vigorously. I'll give each of you a minute in rebuttal after the government states their case. Thank you, Your Honors. May it please the Court? Good morning, Your Honors. David Genrick on behalf of the United States. I'll address this morning the issues that were addressed by counsel in the court and rest on the briefs with respect to the issues that were not covered during oral argument absent any questions. Would you speak up just a little bit or maybe get the mic a little closer to you? And rest on the briefs with respect to any issues that were not argued by counsel or raised by the court unless the court has questions of the government. With one preliminary note, Mr. Pasiga indicated that his argument with respect to the suppression issue was identical to Mr. Finley's argument. The government doesn't agree with that assertion with respect to how the issues are presented before the court. The government suggests that Mr. Finley raised an issue with respect to whether the PC arrest was supported as an intervening cause and Mr. Somerville really attacked the Becker attenuation test. So while not agreeing the issues are identical, I do think they are adequately briefed with respect to Mr. Somerville. With respect to Mr. Finley's argument on whether a reasonable person could conclude that there about the factual findings of the district court here. And I suggest to the court that although the defendant asserts that he's honoring the appropriate legal standard, that his emphasis on the subjective state of mind of Mr. Finley is misplaced here and is really not part of this court's inquiry. The standard is, as is reflected in the briefs in this court's Flores-Lagonas case and the other precedent, is whether from the perspective of the officers, an objectively reasonable officer, that is a reasonable person, could conclude that there was a fair probability that Mr. Finley fled from police. Counsel suggests that subjectively Mr. Finley was terrified by seeing a gun. One, the government suggests that's not the inquiry here. The subjective state of mind of Mr. Finley is not relevant to the determination of whether the officers had PC to arrest here, which is different, as Judge Shepard pointed out, from what we'd litigate at trial with respect to what the defendant's state of mind was beyond a reasonable doubt. Here the issue is whether a reasonable officer and the perceptions of a reasonable officer support the notion that Mr. Finley was running to evade arrest. So at the threshold, the emphasis on whether Mr. Finley was actually in fear is misplaced. I'd also note, Your Honor, that what's the reasoning for the officers to believe that they have properly identified themselves before consummating an arrest? Yes, Your Honor, and the district court's findings here were not clearly erroneous. The officers had a reasonable belief, objectively speaking from their perspective, that Mr. Finley was evading. The officers were dressed in vests and blazoned with police on both front and back. They had their badges prominently displayed. Where were they displayed? On their vests, on the front of their vests. They approached the defendant, opened the door, and issued a command that, as the district court observed, was absolutely consistent with the way in which multiple officers conduct arrests in telling the defendant to put his hands up. And the defendant, in response, looked at the officer, albeit briefly, but looked at the officer and then bolted out of the car. And an objectively reasonable officer, from the perception of the officer, who says, I'm in a police vest, clearly marked, I'm wearing my police badge, I'm approaching the defendant, multiple officers are approaching the defendant and shouting a command to put his hands up, which is, the district court observed, is a traditional command when law enforcement is executing arrests. Defendant looks at you in your vest, with your badge, gun drawn, put your hands up, and then runs. Is there anything in the record about what the policy or practice of the police department is in a warrantless arrest like this, in terms of the announcement police make when effecting that arrest? There is not anything about the MPD policy, Your Honor, but I think the court's questions with respect to whether that's, I believe it was your question, Chief Judge Smith, with respect to whether that's a required factor, is important. The factor of whether the police announce themselves is, of course, relevant to the inquiry about whether a reasonable officer would believe that the defendant is acting in response to police action. But it's not the only factor, and there's no court, case of this court, that suggests it is. The court looks at the totality of the circumstances with respect to the perception of the officer. And it's not an inquiry into the defendant's subjective state of mind, and I just want to suggest one reason why. The government could suggest that the reason that Mr. Finley ran was that there was a loaded nine-millimeter handgun within six inches of his left hand. And that's a reasonable inference, certainly, with respect to defendant's state of mind, but it's not one that this court is asked to make. The defendants didn't testify below about their subjective state of mind. The government didn't suggest that the defendant's subjective state of mind was relevant, because that's not the legal standard. And this court need not resolve what, as the counsel suggests, Finley was actually experiencing. The standard, for good reason, is from the standpoint of an objective officer, what did they perceive Mr. Finley's actions were. With respect to the Flores-Lugones case, Your Honors, Lugones-Flores, I apologize, it is not distinguishable in material respects from this case. The court looked, in Lugones-Flores, the defendant at the threshold asserted, the reason I ran was because I didn't think these were police officers. Someone confronted me with a gun, notwithstanding the fact they announced themselves as police. And I ran because I fled my vehicle because I was afraid. And this court said, black letter, unequivocally, that that's not relevant to this court's inquiry. And then it reviewed the circumstances, the totality of the circumstances, reflecting what a reasonable officer would believe with respect to approaching in plain clothes, but with demarcations that they were police in Lugones-Flores as well, indicating that they were law enforcement, and approaching the defendant to make the arrest. The nature of the commands in this case were different, but under the totality of the circumstances, there's no material difference in whether the perceptions of the police here were reasonable, objectively, with respect to defendant's flight. Counsel, do you believe, under our law, the Minnesota statute of fleeing matters under Flores-Lugones? The statutes, Lugones-Flores was, or Flores-Lugones was a Minnesota case. And it was fleeing via vehicle and then resisting arrest under 6-9-0. Yeah, but counsel, I'm looking at the two paragraphs of the court's opinion, well-written opinion by this court, but I'm looking at those two paragraphs. And the first one acts like just fleeing is enough. And then the next paragraph says, and it uses the word independent, and that's where they go, we the court, go into fleeing a police officer under the Minnesota statute. And then the conclusion sounds like there are two bases for it. Yes. So I'm sure that's the way the government reads it. My interpretation of the court's opinion written by the Chief Judge is that there are two bases. The first being fleeing, and then the next sentence after the discussion, the factual predicates to their fleeing says, there is also probable cause here, essentially, to believe that there's resisting. And I think that framed as there is also probable cause to believe with respect to resisting, which is a separate state statute, would indicate that the court was finding two independent bases. Your Honor, in this case, I think the basis with respect to fleeing on foot under 6-9.487, I think it is, is well-founded. But as the government notes in the footnote in its brief, as in Flores-Laguna, 609.50, which is resisting, would be an independent basis to affirm here, just as it was in this Court's presentation. That case involved a vehicle. Correct. Correct. So the vehicular flight statute is different than the flight on foot statute. But the P.C. determination in this case with respect to the flight on foot statute is supported in the same ways as the P.C. determination in car. The only difference, really, is once the officers perceive that the defendant was fleeing, is the means of flight. But the inquiry as to whether the officers' probable cause supported the officer's perception that the defendant was fleeing by way of flight is materially indistinguishable in the government's view. Your Honors, unless there were additional questions with respect to the District Court's well-reasoned findings and conclusions on Finley's flight, the government would turn to the jury questionnaire issue. Proceed. With respect to the jury questionnaire issue, first I'd like to, again, discuss the law and then discuss with the Court the way in which the District Court proceeded here. So with respect to the law, it's the government's view that the standard for the Court is whether the District Court abused its discretion in conducting voir dire in a way that impaired the defendant's right to a fair and impartial jury, and if it did, whether there was substantial prejudice under the United States v. Bourgeois case cited in the government's footnote in its brief. What's the practice in District Court in Minnesota as to the use of jury questionnaires? I would say that jury questionnaires are being used increasingly in the District of Minnesota, but the standard practice remains not to use questionnaires. There's not a local rule, right? There's not. Of any kind, right? No, there is not. So to what use are they employed? I mean, what's done with them? Is there any standard for access to them? Inform us what you know about the jury questionnaires. Both the use of questionnaires and how they're employed in the course of voir dire is left to the discretion of the trial court of the District Court. The parties, as in this case, can make requests of the Court, both to issue a questionnaire as to its content, whether to review it, but ultimately it's the District Court that makes those decisions. There is no local rule. And as I think Judge Benton, you suggested, there's no precedent in the Eighth Circuit that requires a District Court either to use or distribute jury questionnaires if they've been given the choice. You know, we do have a doctrine called unconstitutional abuse of discretion. You know, that's in our cases. It goes back to the 70s. And I think what that's talking about is structural error. I think that's what an unconstitutional, in this context at least, I won't say beyond this context. And some of our language in the old cases that that comes from, like the Bear Runner case in 1974, that's where a judge used only general questions. Are you familiar with that case? Yes, I am, Your Honor. Okay, good. The judge used only general questions and we reversed and granted a new trial because they were only general questions. And we said it's fundamental any, A and Y, any erosion of the right to extensively examine the near men, it's the 70s, in order to secure a fair and impartial trial, it's prejudicial error. And I think they mean structural error, later called structural error. Okay, now how do you get around the all or nothing part of this case? I don't know. I may have said it too elliptical to the other side, but I think you get it. I do, Your Honor. That is this the kind of thing, though, that is either a structural error and there's a complete new trial or it's not at all? And doesn't that seem like extreme either way? It's not. In the government's view, it is not structural error. And I appreciate the inquiry, Your Honor, because I think it is an important question here, if the court should find that the district court abuses discretion. I'll start with Bear Runner because the court started there, but I'd like then to talk more generally about structural error and in the context of ordeer. So with respect to Bear Runner, Your Honor, I take the court's point with regard to the very broad language regarding the prejudicial error. But the next sentence in that opinion says the right, this right, although firm and absolute, must always be considered in light of all the surrounding circumstances presented by the particular case. And then the court says fundamental fairness in the present case requires a new trial. So I think there is some tension in the court's language there between something that seems to suggest a blanket prejudicial approach, but the next sentence says, look, this is an important right, but we still view all the circumstances in context and we think in this case that fundamental fairness was violated. Now, why? You know, the third, you read the third sentence. Thank you. Yes. It seems to go back to the first sentence a little bit. Yes. Yeah. And so why in Bear Runner is there that sort of indication about the importance of the right? Well, and it is an important right. In Bear Runner, it's a race case. The court says that the issue was that the district court did not ask appropriately probing questions about, quote, the American Indian race, close quote. That's the court's words of the defendant. And race, the racial composition of a jury is the one area of ordeer where courts, circuit and the Supreme Court, have either explicitly adopted structural error or in the case of the Supreme Court all but explicitly indicated that if a jury is composed in a way that violates Batson or other race-based norms with respect to ordeer, it is structural error. Well, counsel, as you know, no, you don't know. But suppose I told you that there are many jurors who displayed that they would have difficulty being fair and impartial, in this case because defendants are African-American. And there are, I haven't counted them, about 10 or 12 in the files. So how does that affect you? Well, it affects, I think, in two ways. First, with respect to the threshold question. Did the district court abuse its discretion in the manner in which it conducted ordeer? The court's ultimate inquiry is whether the actual composition of the jury was fair and impartial. And I think Chief Judge Smith asked whether there's any indication on this record that it was not. And I think the defense counsel answered candidly that there's not any indication it wasn't. Is the racial composition of the jury such as it was determined in the record? I imagine that the biographical information available to the parties with respect to the jurors is part of the record. I don't know what the racial composition was. Yeah. Anything in the district court is fine. Go ahead. And that's not really the challenge here with respect to the racial composition of the jury. No, I understand. It's about whether the process was fair and impartial. I think the court — Was there any oral questioning of the jurors that were seated? Oh, yes. Yeah. The court conducted standard ordeer, gave the defense and the prosecution an opportunity to approach and ask if there were any further inquiries that they would like to make. Did you submit questions before trial? Yes. Yeah, and that's a matter of record. Those are in the district court docket. Well, generally does this — let's talk about this case. In this case, did the judge take most of them you offered or not? I think probably the defense suggestions were more extensive than the prosecutions, but I would represent to the court that the district court made full and fair inquiry over all the standard subjects of ordeer, where they — I think it's rarely true, frankly, Your Honor, especially in federal court versus state court, that federal ordeer covers all of the topics or in the requested depth that parties requested, as this Court's aware. So, Your Honor — and I do want to provide the second part to the answer. The first part is, did this process violate — was an abuse of discretion, the process the district court actually used with respect to seating this jury? The second question is, if it was an abuse of discretion, would the content of — would the fact that the questionnaires weren't shared equal structural error? And, Your Honor, this is where I think your question about what the actual content of the questionnaires dovetails with the government's position, which is, if this court finds that the district court should have provided the questionnaires and the government, again, doesn't agree, it thinks that the process used — actually used what produced a fair and impartial jury. But if the court disagrees, the appropriate remedy here is to remand for a determination in the first instance by the district court, looking at the questionnaires that the jurors were actually seated. Because the focus is on the Sixth Amendment right to a fair and impartial jury as to whether what wasn't disclosed turned out to be substantially prejudicial under the standard announced in Bourgeois, which is a case after Bear Runner. And I do want to just quickly note with respect to structural versus substantial prejudice, Your Honors, that in other jury instruction contexts, the Supreme Court and this Court have applied a substantial prejudice standard. So the Supreme Court decision — and I can put these in a 28-J — but the Supreme Court decision in Rivera v. Illinois, 556 U.S. 148, says, if you are — if you make a motion for cause and the district court denies it improperly and you have to use a peremptory and you come to the appellate court and you say, you know, I would have used my peremptory on someone else and the jury composition would have been different as a result, this is structural error. Supreme Court says no in Rivera. And this Court said that before Rivera, actually. With respect to an ineffective assistance claim that a defense counsel doesn't pursue a Batson challenge when he or she should have. This Court says that's not structural error. And one example of that is the Kehoe case, L28J at 7-12, Feb. 3, 1256. Recently, in a glaris tovar, an unpublished decision of this Court after briefing, 2022 Westlaw 334-9124, L28J, this Court approached whether the district court conducted voir dire in a way that was an abuse of discretion. And in one of the inquiries was, well, it's not, whether it was an abuse of discretion or not doesn't matter because the juror that was the subject of the defense challenge wasn't ultimately seated. So there was no substantial prejudice because that juror wasn't seated as part of the actual panel. So outside of the Batson context, what the government is suggesting is that no court has found structural error based on abuse of discretion regarding the manner in which a district court conducts voir dire. The courts review whether the actual jury seated in the box was fair and impartial in terms of substantial prejudice as a result of any error in which the district court made in conducting the inquiry. Counsel, I'm gathering from your argument that you haven't seen the questionnaires. I have not. Did the government ask for the questionnaires as part of the, during the appeal? I know the ruling of the district court judge, but during this appeal process, has the government requested the questionnaires? The government has not and to the extent it would have been appropriate to do so. The government regrets not doing so. But I must say, I share Mr. Presigo's, I guess, perhaps cautious approach that once the district court prevented us from seeing the questionnaires, we didn't ask for them. But I'd also note, Your Honor, that the government's position is the content of the questionnaires isn't relevant with respect under these circumstances to whether the district court abuses discretion because the protocol that voir dire actually conducted satisfied constitutional standards. So that did enter the government's thinking as well. Counsel, at court, you said we don't take a position on this issue. The government says we don't take a position on this issue, right? That we left it to the discretion of the district court, absolutely. Your words, we don't take a position on this issue, right? Yes. Is that still your position? Well, I'm not, I'm not suggesting that the district court, I don't, I'm not suggesting. It's simple. The government's position at trial, we don't take a position on this issue. You know what I'm quoting, don't you? I do. Yes. That's word for word. Yes. Okay. Roger, is that still the government's position? Well, no. On appeal, we have a position that the district court did not abuse its discretion in not providing the questionnaires. But I think the nuance there, Your Honor, is had the district court provided the questionnaires, would the government have argued it was abuse of discretion? That's a speculative question. But our response to the district court, that it's in your discretion, covers both circumstances. But, of course, on appeal, we're going to defend the district court's decision to conduct standard vortier. Counsel, just, can I answer? Yes. What's your recollection or understanding? Did you try the case? I did not. Okay. Do you know whether, how the questionnaires came about? Were they at the request of the parties? Or is that this standard practice of this particular judge? Your Honor, ask the second. I am, I can confidently represent it's not a standard practice of Judge Magnuson. In fact, he rarely uses questionnaires. As to how it came about, my understanding is it was a subject to discussion in the pretrial conference. And I'm actually not sure whether it was initiated by the district court or by the parties with respect to the use of the questionnaire. But Judge Magnuson does not make common use of jury questionnaires. Counsel, he does say the court has indicated it was going to use questionnaires in this case. Yes. That's how he opens the colloquy. Yes. And that was a carryover from the pretrial conference. And in fact, all of you proposed questions for that. Well, the parties submitted proposed vortier, but they were not submitted in the form of a questionnaire. Now, the district court may well have incorporated questions from the parties' vortier. Counsel, may I ask another question? Sure. I'm sorry. I thought those were easy questions. He says at least both defense teams submitted proposed questionnaires. Okay. So you're saying the government didn't, but the defense did. Is that your point? What I'm suggesting is that, so I don't know is the precise answer. Okay. That's good. Okay, good. It's not a part of the, they weren't filed, Your Honor. No, no, I understand. Thank you. Thank you, Your Honor. Thank you, Mr. Gindberg. Mr. Meyers, your rebuttal. Are you judging between one minute each? Yes. Okay. Two points. One, the officer versus Finley's perspective. I embrace and acknowledge that we judge it from the perspective of the officer, but it has to be with respect to the specific crime that's being committed. It's an essential element of that crime that the person is committing. The person fleeing knows they're fleeing police. So let's look at what the cops knew. They knew they didn't say cops. The two officers who accosted them, Stetson and Dottle, were wearing plain clothes with a vest on it. They knew they held the gun with two hands. They knew that holding the gun with two hands obscures the word police. This is all from the motions hearing from a testimony of an officer on pages 59 and 60. They knew the people with the gun pointed at them focused on the gun and not the finer points of the person's garb. They knew that if you don't yell police, it's possible that the person does not know they're accosters or cops. And they knew that if you don't say police, it is less likely that the person accosted knows that they're accoster as police. This is an officer's testimony about what they knew based on those circumstances. They knew all those things. It was in their power whether they decided to say police or take further steps to identify themselves. They need to know there's probable cause to believe that offense is committed. The final point I'd like to make on Flores-Lagunas, Flores-Lagunas did not involve as a factual matter resisting. It involved fleeing and reckless driving. That's on page 560 of the opinion. It says we conclude that there was probable cause based on the fleeing and the reckless driving. Thank you. Mr. Pasiga. Thank you. The case law presented in this particular case, this case, this issue about these questionnaires is particular and unique. And it cries for reversal. We view all of the circumstances in context. The case law you were discussing, look at this situation in context. It is truly unique. The content of these questionnaires is not relevant. That's what the government said today on race issues. That simply cannot be in an American courtroom. Did you have input into the composition of the jury questionnaire? I did try the case and Mr. Calhoun-Lopez was the government lawyer. From what I recall, don't hold me to this, I think we exchanged versions of a proposed questionnaire for the court. But ultimately, Judge Magnuson may have incorporated some of our proposals and had his own. Was the questionnaire a function of the desire of the parties or imposed by the court? I think it was a desire of the parties at that point in time. There was also a COVID element going on at the time. So courts were using more questionnaires because of some of the COVID issues that jurors were facing at the time as well. But make no mistake, one of the big important things here was, are you going to look at African American defendants differently in a criminal case? And are you going to believe or not believe law enforcement in a criminal case, especially with what we had going on here in Minneapolis at the time? You referred to these questionnaires and perhaps 10 prospective jurors talking about whether they can be fair to an African American that's on trial in a criminal case. I don't know how that's not relevant. I don't know how that's not structural error. If you were the lawyer for the defendant and you see a prospective juror saying, I might not be fair to a black person who's on trial, would you try to exercise a strike for cause? We were deprived of that opportunity. If you were denied that strike for cause, would you use a peremptory on them? We were denied that opportunity. Would you want to know that? The court had that information. Once the court got that information back, it absolutely had a duty to share that with the lawyers. We were deprived of it. It was a unique error. But it is a grave error in this trial and it calls for reversal and a remand for a new trial. Thank you. Thank you, Mr. Passillo. Court notes.